# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

**JOHN A. ROSS, JR.**                                    **PETITIONER**

**VS.**                          **CIVIL ACTION NO.: 4:14-cv-87-SA-JMV**

**CHRISTOPHER B. EPPS, ET AL.**                      **RESPONDENTS**

## REPORT AND RECOMMENDATION

Petitioner John A. Ross, Jr., a state prisoner appearing through counsel, brings this successive petition, seeking a federal writ of habeas corpus under 28 U.S.C. § 2254 as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Currently before the court is the State's Motion to Dismiss Petitioner's Successive Habeas Petition [13]. The United States District Judge has referred the matter to the undersigned Magistrate Judge for a hearing and report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

As is more fully discussed hereafter, Ross has failed to satisfy the requirements set forth in 28 U.S.C. § 2244(b)(2)(B)(i) and (ii) for consideration of a successive petition's merits. Thus, it is recommended the petition be dismissed.

Section 2244(b)(2)(B)(i) requires that the factual predicate(s) for any constitutional claim(s) asserted by way of a successive petition could not have been previously discovered through the exercise of due diligence. Section §2244(b)(2)(B) (ii) requires a petitioner to establish that the facts underlying his constitutional claims, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense. Stated differently, although Ross received authorization from the Fifth Circuit to file a successive petition in this court, that authorization in itself does not give this

court jurisdiction to consider the merits of the petition. Instead, it merely gives Ross an opportunity in this court to *actually* satisfy the requirements of § 2244(b)(2)(B)(i) and (ii) before the court may further consider the petition. Failing to satisfy these statutory prerequisites will result in a petition, as here, being dismissed pursuant to § 2244(b)(4).

## I. Background

## A. The Trial

### 1. Deidre Ross' Death and the Crime Scene Investigation[1]

At or shortly after 2:00 a.m. on the morning of May 22, 2000, Petitioner's wife, Deidre Ross, (hereafter "Deidre") was shot to death in his presence in their bedroom. When officers arrived at approximately 2:30 a.m., Deidre, who was right-handed, was observed lying in the bed and "had a gun in her left hand, and it was laying sort of on her chest. May have been a little bit below her breast."

Earlier that evening, Ross and Deidre, had attended a party. During the party, both Deidre and Ross were drinking. But, it was difficult to tell whether Ross was drunk. Greg Switzer, the husband of Deidre's best friend, testified he and his wife went to the party with Ross and Deidre. According to Switzer, Deidre was having a good time and was not depressed. Switzer testified, at some point during the evening, Ross and Deidre had an argument, and afterwards, "[Ross] threw a beer bottle in [Deidre and her friend's] direction. I remember it because it must have been full because it just flipped and flipped and spewed and spewed." Ross "was obviously angry." After viewing a picture of Deidre's injuries post-death, Switzer testified Deidre did not have any of those injuries when he left the party. Switzer noted, after death, Deidre was "[b]ruised, battered, blood. Just doesn't hardly look like the same person." On redirect examination, Switzer testified

---

[1] For the sake of brevity, the court has not referenced each page of the trial transcript from which the following is taken. To ascertain the page of the referenced trial transcript the reader is directed to Ross's Petition [1], Respondent's Motion to Dismiss [8], Petitioner's Response [10], and Respondent's Reply [12].

he observed Ross beating Deidre on a previous occasion, saying, "[w]e were in their van. John Ross and I were in the back seat directly behind the front seat. And they were arguing about something and he was slapping her in the back of the head so much so we had to pull the van over to stop."

 Likewise, Charlie Ross, who was lifelong friend of Deidre's and was in the band playing at the party that evening, testified Deidre did not have any injuries when he saw her at the party and she was not depressed. Ross also testified, around 10:30 p.m. or 10:45 p.m. that evening, "all of the sudden I saw Mr. Ross come up to Deidre and kind of jerk her off the dance floor. Wasn't really a dance floor. It was grass. That was the last I saw." Further, Ricky Gullett, who had sponsored the party, testified Deirdre had no visible injuries that evening and did not seem depressed. Gullett also witnessed Ross physically removing Deidre from the party, testifying "[Ross] was ready to go and asked her to come on and go, and then he grabbed her by the arm and she jerked away from him and he told her to get her g-d-a in the car."

During his case in chief, Ross called his friend Donald Wayne Steed who had been at the party that evening.  During his testimony, a tape recording of a previous interview where Ross had been present was played, during which Ross acknowledged he and Deidre had fought at the party and stated "[w]hat started the whole nine yards was it was 12 o'clock, and I said, 'Let's go home.' And she said, 'No.'"

Two of Ross and Deidre's children testified at trial. Taylor Ross testified, after her parents came home from the party, "we were all in the living room, and my brother was asleep, but I woke up and I saw – I looked down the hallway and I saw my mama on the floor screaming and yelling." Likewise, John Ross III testified his mother was not simply screaming but

"hollering" actual words that night. Both children testified they went back to sleep after hearing the yelling and only fully woke up later, after their mother had been shot.

Lane Kimbrell, the E-911 coordinator, testified 911 received a call from the Ross residence at 2:29 a.m. on May 21, 2000. A recording of the 911 call was played for the jury. The 911 call ended at 2:31 a.m., and dispatch records reflected the first officer was on the scene at 2:33 a.m.

Officer Terry Cobb testified he and Officer Charles Campbell were the first two officers on the scene. Cobb stated, after they knocked, "[i]t was a while" before someone came to the door." Cobb testified he "noticed that [Ross] had bruises on his arms and I know that he had blood on his hands, specks of blood on the shirt that he was wearing." Cobb identified photographs of Ross' injuries and the blood on his clothing. Likewise, Officer Campbell testified Ross had blood on his arms and clothing and scratches on his arms.

Joe Lee Kent, one of the ambulance personnel, testified Diedre, who was still under the bed covers when he arrived, had "some bruises on – in her face and a wound to her upper – above her ear." Kent thought it was "unusual" for the gun to be on her chest. Further, Kent testified he overheard Ross tell his partner "that they had been fighting that night, and he — when they got through fighting, he had went to the bathroom, and as he was in the bathroom, he heard a gunshot. And when he came out the bathroom and entered the bedroom, he found the wife laying there in the bed had been shot."

Charles Smith, the Chief Investigator with the Indianola Police Department, was also on the scene. Investigator Smith testified Ross said he and Deidre were fighting that night and he got up from their bed and walked to the chifforobe or chest of drawers with his back to Deidre to get some clothes and suddenly heard a gunshot. He testified Ross said "he tried to wipe some of

the blood away and stuff like that," and noted he did not observe blood except in the "immediate proximity" of the victim. Ross told Investigator Smith "he and his wife had had several arguments that Saturday afternoon prior to going to a dance or something." Ross also acknowledged he had called his mother to come and get the children prior to calling 911.

Jon Byrd, a latent fingerprint examiner for the Mississippi Crime Lab, testified he had tested the gun for fingerprints but was unable to develop any identifiable prints. Byrd acknowledged his report did not indicate the gun had been wiped down but stated "[h]owever, that does not mean that it did or didn't happen." Grant Dale Graham, a senior crime scene analyst with the Mississippi Crime Lab, also testified. Graham noted the photos of the crime scene indicated the blanket on the victim had been moved. Graham testified the blood stains on the victim's cheek and bicep had no apparent source and indicated that something had been in contact with the victim and later moved. Likewise, the smear on the top of the victim's breast was consistent with the blanket having "been on top of her breast and actually caused this type of stain here. And then it was pulled away." Graham further stated that the amount of blood on Ross' shirt was inconsistent with his statement that he held Deirdre and tried to stop the bleeding.

David Whitehead, a forensic scientist with the Mississippi Crime Lab, testified he tested samples from the victim's hands for gunshot residue. Whitehead testified "particles of gunshot residue were positively identified" on the back of the victim's left hand, and "one particle of gunshot residue was observed to be present" on the victim's left palm. The victim's right hand was negative for gunshot reside. Whitehead testified the gunshot residue could be consistent with the victim firing the gun. He testified:

> I can basically say that the person was in the environment of a discharged weapon which means one of three things happened. A

person discharged the weapon themselves; they were close enough to a weapon when it was discharged when not actually discharging the weapon themselves to get residue that way; or they handled something with residue on it to get the transfer. Now, which of those scenarios happened, I don't know.

Whitehead noted the gunshot residue could have been on Deidre's hand if it was within two to three feet of the gunshot. He noted if a person were to have blood on his hands, like Ross did, it would not be possible to collect a gunshot residue sample on that person. Whitehead also remarked, based on the photographs, if the gun had been placed in the victim's hand after death, he would expect to find the gunshot residue that was found on Deidre's hands. Whitehead noted, if Ross had wiped the gun, "[h]e probably would have wiped off a great portion of the residue." He also acknowledged, "if he wiped it clean," there would have been no gunshot residue. However, the gun was not wiped completely clean, as is evidenced by the fact that partial fingerprints remained.

Carmen McIntire, a forensic toxicologist for the Mississippi Crime Lab, testified there was .22 ethyl alcohol content and evidence of caffeine in Deidre's blood. McIntire testified no evidence of antidepressants was present in the victim's blood. She also noted the victim's "urine contained 0.31 percent ethyl alcohol, caffeine, and methamphetamine." On cross-examination, McIntire acknowledged it was "a possibility" that Deidre could have taken methamphetamine within a couple of hours of death, later using the term "probable." However, McIntire noted on redirect it was possible Deidre had ingested the methamphetamine up to four (4) days prior to death. McIntire testified, at the time of her death, Deidre was only under the influence of caffeine and alcohol, as these were the only substances present in her bloodstream. McIntire also noted "[m]ethamphetamine can be detected in the urine anywhere from two to four days, so for as many as four days ago it could have been the time methamphetamine was taken."

Ross called Sandra Reed, the Check Unit Director for the District Attorney's Office, to testify that the victim, prior to her death, had been contacted about a bad check in the amount of $226.33. Reed acknowledged it is not uncommon for the bad checks in their unit to never be paid off. In addition, Ross called Everett Williams, Jr., who testified he had only ever seen the victim shoot a rifle, and she was not a very good shot. Williams also testified Ross was very jealous of Deidre and had even accused Williams of having an affair with her. Deidre had weight loss surgery about a year and a half prior to her death and had lost over 150 pounds and, at the time of her death, had a "tummy tuck" scheduled. Further, even Ross's witnesses acknowledged at the party that evening, Deidre did not have any of the bruises or injuries that she bore after death.

## 2. The forensic pathologists, Dr. Steven Hayne and Dr. James Bryant

Dr. Steven Hayne, M.D. (hereafter "Hayne") performed the autopsy on Deidre's body. Hayne introduced himself to the court and jury as "a state pathologist for the Department of Public Safety, Medical Examiner's Office for the State of Mississippi." He testified he was "[b]oard certified in anatomic pathology, clinical pathology, forensic pathology, and forensic medicine" Further, Hayne testified he conducted his autopsy pursuant to the "Coroner's Reorganization Act of 1986, amended." On cross examination, he stated he was not testifying on behalf of the State but on behalf of the "coroner's office." He also testified he conducts, on average, four autopsies per day and he works 365 days a year. He estimated, at that time, he had been qualified in Mississippi courts as an expert in forensic pathology in roughly 1,700 cases. In Ross's case, he was offered by the state as an expert in forensic pathology and, hearing no objection from Ross's counsel, was accepted by the court as qualified.

Hayne testified during Deidre's autopsy he noted various abrasions and contusions on her face, arms, legs, and back. He testified these injuries were "consistent with defensive posturing

rendering such that would be inflicted on a person who was trying to ward off injury to their face, neck, and chest." Hayne later stated the injuries could have been produced by other causes, such as falling or running into a stationary object, and he did not consider whether Deidre was under the influence of alcohol or methamphetamine when he was generating this "defensive posture theory."

Hayne testified, in his opinion, Deidre had not commit suicide but, instead, was the victim of a homicide. He based this opinion on the positioning of Deidre's body, the fact that the gun was in her left hand even though she was right-handed, the distance of the muzzle from Deidre on firing, the location of the entry wound, and the trajectory or angle of the bullet's path from the left side of Deidre's head to where it came to rest on the inside of the right side of her skull.

In order to determine muzzle distance at the time the gun was fired, Hayne enlisted Dr. Michael West (hereafter "West"), a dentist from Hattiesburg. At a pre-trial deposition, Hayne claimed the gun's muzzle was six to eight inches from Deidre's head when it was fired. But, he further stated the exact distance would have to be determined by test firing the subject gun using the same ammunition. Later, after the gun was test fired by West in Hayne's presence, Hayne concluded the distance was instead only two to three inches. This distance, he claimed, was more consistent with homicide than suicide. Because Remington, the ammunition maker, had discontinued the specific type of ammunition used in Deidre's death, West re-created this type of bullet by measuring the amount of gunpowder in an unfired cartridge found in the gun, and personally reloading it with the same amount of gunpowder the bullets that he test-fired. West then test-fired the pistol into "regular ... white paper" and "freshly harvested canine skin," which had been "shaved ... down removing the hair to see at which level the tattooing would mimic

what was found at the autopsy." When a prosecutor inquired whether they had "go[ne] out and kill[ed] a dog to do this," West answered, "No, ma'am. We went to the humane society and harvested some skin from dogs that had been euthanized that day." West later offered he and Hayne "[u]sually ... use porcine, pig skin. But when you have a pattern that involves the hair of the head, you have to try to get a target that has hair that can simulate the head hair of a human and the hair on the pig is too sparse ... so we chose to use canine."

Hayne testified he arrived at the approximate location of the entry wound on Deidre's head by placing her body in an anatomically correct position and measuring with a special type of ruler. He concluded the wound was four and one-half inches from the top of Deidre's head, three and a quarter inches forward from the back of the head, and one and one-half inches above the left ear.  He also testified he observed the bullet's path or trajectory through Deidre's head from the entry site to the resting point on the interior of the right side of her skull. He testified the bullet travelled downward at a 5-degree angle and forward 30-degrees. At trial, he demonstrated the trajectory using a Styrofoam model of a head and a stiff wire, and he testified that the trajectory of the bullet was consistent with the muzzle of the gun having been angled slightly downward and forward on discharge. Hayne testified he tried various positions, but he could not manage to positon a pistol, similar in size to that at issue in Ross's case, at the same angle and distance from his own head. He testified that he could not accomplish this in any positon he tried, including with his right arm above his head in the positon Deidre's was documented to have been found at the crime scene. Ultimately, Hayne opined Deidre's wound was not self-inflicted.

West originally testified a woman who was 5'7'' and 170 pounds would have no problem holding a gun at the angle and distance to which Hayne testified, but he changed his testimony

on redirect, saying by holding the gun himself, he "attempted to achieve" this particular trajectory and distance "but could not."

Hayne also testified, in his experience, it is more likely for a woman to shoot herself in the chest than in the head. Hayne testified he sees head shots in women far less than in the chest. "Maybe at a ratio of less than four, five to one." Hayne was not asked and did not identify, produce, or cite any scientific or peer reviewed literature in collaboration of his experience.

Hayne's opinions differed from those of Dr. James Bryant (hereafter "Bryant"), the defense's pathology expert. Because the court denied Bryant's request to exhume Deidre's body, he relied on Hayne's autopsy report, deposition, crime lab reports, medical records, and photographs to assist him in preparing his opinion. Bryant, who testified he was not board certified in forensic pathology by the American Board of Pathology (ABP), countered Hayne's findings and concluded a lethal combination of alcoholism, depression, methamphetamine, and multiple antidepressant medications led to Deidre's suicide.

Bryant testified he based this opinion on the allegation that "she is a depressed patient who has been depressed for months according to her medical records. She's taking drugs that one of – the side effect of one of which is suicide attempt. She's also on alcohol and anti-depressant combinations which is – makes her problems worse." Bryant stated, at the time of her death, the victim was "good and drunk" with a blood alcohol content of between .22 and .31. However, it was pointed out to Bryant that no anti-depressants were found in her blood.

Bryant testified he agreed with Hayne's finding that the bruises to the victim's arms and legs were no more than six (6) hours old, noting, "[w]ell, she has bruises on her arms and legs that were done that day. That's what that looks like to me." However, Bryant testified he could not call the injuries "defensive posturing" without testimony of a witness who had actually

observed a fight.  Bryant agreed with Hayne that the bruises had been caused by blunt force trauma but stated he could not say what had caused the injuries. However, he later conceded Deidre's injuries could be consistent with her having been in a fight. Bryant testified the cause of Deidre's blackened right eye was the result of orbital bleeding, which occurs after traumatic head injuries, such as a gunshot wound.

Bryant stated he could not explain why there were no finger prints on the gun, noting "[h]er fingers are touching the gun, so the fact that there's no print there, I don't understand that." Bryant also testified he was aware of Hayne's opinion that the barrel of the gun that killed Deidre was two to four inches away from her scalp.

While Hayne testified Deidre could not have pulled the trigger, Bryant opined the short barrel of the gun that killed her made it very likely she could have shot herself at the particular angle and distance testified to by Hayne as existing on discharge of the gun.

### B. The Prior Habeas Petition

Ross has previously filed a *pro se* habeas petition, challenging his murder conviction and sentence in this court in Cause No. 4:05cv121-P-B. In that petition, and relevant for purposes of this successive petition, Ross raised as a ground for relief the claim that the testimony of Hayne failed to meet standards of expert testimony admissibility.

Ross's first habeas petition was found to be without merit and denied.  *Ross v. Greer*, No. 4:05cv121-P-B, 2008 WL 4446601 (N.D. Miss. Sept. 25, 2008).

### II. The Successive Habeas Petition

In his successive habeas petition, Ross asserts that, but for violation of his constitutional rights as articulated in  *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963), and the Sixth Amendment's Confrontation Clause, no reasonable juror would have found

him guilty of his wife's murder. Ross relies on twelve alleged factual predicates in support of his constitutional claims and cites, in approximately 300 footnotes, to nearly 3000 pages of alleged evidence in the form of 68 appendices, spanning a 50-year period, in support of those factual predicates.   His constitutional claims and their factual predicates are as follows:

### A. The Brady Claims and their Factual Predicates

A "Brady claim" refers to a violation of a criminal defendant's constitutional due process right.  As explained in *Brady v. Maryland*, the state has a duty to disclose material evidence favorable to the defendant.  373 U.S. 83, 87 (1963).  A violation of the duty deprives a defendant of his right to a fair trial.  *Id.*  To establish a Brady violation, a criminal defendant must show: (1) the government possessed evidence favorable to the defendant (including impeachment evidence); (2) the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.  *U.S. v. Spagnoulo,* 960 F.2d 990, 994 (11th Cir. 1992); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Ross contends he has newly discovered evidence that his constitutional right, as articulated in *Brady,* was violated by the State at his 2002 trial when the State failed to disclose to him (1) it had an alleged unethical business arrangement with Hayne; (2) Hayne testified falsely, prior to  and at Ross's trial, that he was board certified in forensic pathology;  (3) Hayne testified , falsely prior to Ross's trial, about the circumstances surrounding the fact he failed the American Board of Pathology certification exam in 1989; (4) Hayne testified falsely , prior to and at Ross's trial, he was board certified or had the equivalent of board certification in forensic medicine (as distinct from forensic pathology); (5) Hayne testified falsely , prior to  Ross's trial,

12

he had undertaken certain professional and scholarly activities; (6) Hayne testified falsely, prior to Ross's trial, to certain educational accomplishments; (7) Hayne testified falsely at Ross's trial concerning his ability to determine the angle between a shooter and a victim; and (8) Hayne testified falsely at Ross's trial concerning his ability to determine a bullet's trajectory through a person's head.

### B. The Napue Claims and their Factual Predicates:

A "Napue claim" is a violation of a criminal defendant's constitutional right to due process occasioned by a prosecuting or other government attorney's knowledge, but failure to disclose, that a witness's material testimony is false. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Ross relies on many of the same alleged newly discovered factual predicates for his *Napue* claims as he does for his *Brady* claims. But, he asserts additional factual predicates as well. In particular, he alleges the state elicited false testimony from Hayne at Ross's trial to the effect that: (1) he was a state pathologist for the Department of Public Safety Medical Examiner's Office for the State of Mississippi. Ross asserts the false implication of this testimony was that Hayne was an employee of the state Medical Examiner's Office, and therefore according to Ross, he was a neutral disinterested witness for the state; (2) the gun that killed Deidre was pointed at a certain angle relative to Deidre's entrance wound; (3) the gun that killed Deidre was at a certain distance from her head when she was shot; (4) the bullet that killed Deidre traveled a certain trajectory upon entry into the Deidre's head; (5) Deidre's bruises were from blunt force trauma from a hand or foot; and (6) women shoot themselves in the chest more often than the head at a ratio of 4 to 5 to 1 ratio.

### C. The Confrontation Clause Claim and its Factual Predicates

The essential purpose of the Confrontation Clause is to secure for the opponent the opportunity of cross examination. A criminal defendant states a Confrontation Clause violation by showing he was prohibited from engaging in otherwise appropriate cross examination designed to show bias on the part of a witness. *Delaware v. Van Arsdell*, 475 U.S. 673, 680 (1986).

As for the alleged newly discovered factual predicate(s) for his Confrontation Clause claims, Ross makes no particularized allegations  Instead, he relies on the following general premise, apparently intended to incorporate by reference each of the factual predicates giving rise to his *Brady* and *Napue* claims. He recites: "Had Ross's trial counsel been privy to impeaching information about Hayne – almost all of which was required by law to be disclosed – confronting Hayne with this material during cross examination would have provided a significantly different impression of Hayne's credibility than the one the state presented to the jury on direct examination."

### D. Permission to Proceed with a Successive Petition

Ross sought permission from a three-judge panel of the United States Court of Appeals for the Fifth Circuit to proceed with the instant successive petition. On March 13, 2014, a panel of Fifth Circuit judges granted Ross permission to file his successive petition in this court. *In re: John A. Ross, Jr.*, No. 13-60909, slip op. at 4 (5th Cir. Mar. 13, 2014). In its Order, the panel held "to the extent Ross's present application relates to Hayne's testimony, it alleges not that Hayne's practices were not sufficiently based in science for him to form a reliable opinion in Ross's case specifically [a claim that had been raised in the prior petition], but that regardless of the procedures Hayne employed, he was not qualified to form *any* forensic opinion and was not credible as a witness generally." *Id.* at 3 (emphasis in original).

Having concluded Ross established a prima facia showing that his claims were not raised in a prior petition (and thus could not be dismissed summarily on that basis alone under § 2244(b)(1)), the court further found Ross had made a "sufficient showing of possible satisfaction" of the dual § 2244(b)(2)(B)(i) and (ii) prerequisites to this court's merits review of his claims. *Id.* It cautioned, however, its finding was only tentative and directed this court to "conduct a 'thorough review' in order to 'independently determine whether the petition actually satisfies the stringent §2244(b)(2) requirements.'"[2] *Id.* at 4. Judge Haynes dissented, arguing Ross had failed to establish a prima facia case of satisfying the requirements of either § 244(b)(1) or §2244(b)(2)B(i) and (ii). *Id.* at 5-9 (Haynes, C.J., dissenting).

### III. The Legal Standards Ross Must Meet:

As the Fifth Circuit explained in its authorization allowing Ross to file his successive habeas petition in this court, that authorization amounts only to a finding that Petitioner has made a prima facie showing that his application to file a successive petition satisfies the requirements of § 2244(b)(2) (B)(i)and (ii). The district court must still independently review the proffered evidence. It is obligated to dismiss any claim the court of appeals has authorized to be filed, unless the applicant shows the claim actually satisfies the requirements of § 2244(b)(2) (B)(i) and (ii). *See* 28 U.S.C. § 2244(b)(4).

As such, the following discussion does not turn on the merits of Petitioner's constitutional claims but on whether Petitioner has met the requirements of § 2244(b)(2)(B)(i) and (ii). To do so, Ross must: (1) establish the factual predicate(s) for his constitutional claim(s)

---

[2] When the Fifth Circuit authorized Ross's petition, it explained the conclusion that the claims asserted by Ross in his successive petition had not, in violation of § 2244(b) (1), been previously raised was only a prima facia finding. However, the undersigned need not examine whether Ross has actually satisfied § 2244(b)(1). That examination is not necessary because if the court finds Ross has actually satisfied § 2244 (b)(2)(B)(i) and( ii) (which he must to proceed), by definition he could not have previously asserted the claims at issue in the successive petition. Conversely, if the court finds Ross does not actually satisfy § 2244 (b)(2)(B)(i) and( ii), it is irrelevant that he has or has not actually met the §2244(b) (1) standard.

could not have been discovered previously through the exercise of due diligence; and (2) establish that the facts underlying the constitutional claims, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found Ross guilty of the underlying offense.

The requirement of previous un-discoverability in § 2244(b)(2)(B)(i) is not otherwise defined in the AEDPA – an Act which has been regularly criticized as hardly a model of legislative drafting. *Lindh v. Murphy*, 117 S.Ct. 2059 (1997). However in *Kutzner v. Cockrell,* 303 F.3d. 333 (5th Cir. 2002), the court stated the alleged new evidence must not have been discoverable with due diligence as of the date on which a prior habeas petition was filed or, as was indicated in *Reed v. Quarterman*, No. 3-06-CV-1113-B, 2006 WL 3690389 (N.D. Tex. Dec. 13, 2006), by the time by which the initial petition could have been amended. Ross's initial habeas petition was filed in March 2005, was amended in October 2005, and remained pending until 2008. Consequently, any factual predicate that could have been, with due diligence, discovered by Ross prior to March 2005, or even October 2005, may not serve as a foundation for a successive petition under § 2244(b)(2)(B)(i).

This court must also look to case law, rather than the statute itself, to discern the proper measure of due diligence required of a petitioner in discovering any new factual predicate. In the Fifth Circuit, this measure is an objective one, as opposed to the subjective diligence of the particular petitioner of record. *Johnson v. Dretke*, 442 F.3d. 901, 908 (5th Cir. 2006).

Furthermore, Ross may not, as he initially suggested, unqualifiedly avoid the necessity of establishing compliance with § 2244(b)(2)(B)(b)(i)'s prior un-discoverability/due diligence mandate by simply asserting that the new evidence should have been disclosed by the State

under its disclosure obligations articulated in *Brady. Id.* In *Johnson,* the court held that where a petitioner had pretrial notice of the potential for exculpatory evidence existing yet undisclosed to him, he may not rely on the ultimate merits of his *Brady* claims to demonstrate his own due diligence as is required under § 2244(b)(2)(B)(b)(i). *Johnson*, however, left some question as to whether a petitioner may rely on the ultimate merits of his *Brady* claims to satisfy his due diligence obligation in the absence of proof that he should have earlier realized a potential Brady violation occurred. A split among the circuits exists on that issue. The Fourth and Ninth Circuits hold a petitioner may not overstep his due diligence obligation by merely asserting a *Brady* violation. *Evans v. Smith*, 220 F.3d. 306, 322-23 (4th Cir. 2000); *Cooper v. Woodford*, 358 F.3d 1117, 1119-20 (9th Cir. 2004); *cf.*, Willis v. Jones, 329 F. App'x 7, 16-17 (6th Cir. 2009) (Due diligence not required where petitioner alleges a Brady violation.). The undersigned is of the view that because satisfaction of § 2244(b)(2)(B)(b)(i) is a jurisdictional prerequisite to considering the merits of a successive petition's constitutional claims, the court may not dispense with requiring a petitioner to actually satisfy his due diligence obligation under § 2244(b)(2)(B)(b)(i) by collapsing it in to the merits review of the petitioner's Brady claims. However, since *Johnson* left the issue somewhat open, the court will conduct its following analysis applying the Fifth Circuit's holding in *Johnson,* as well as taking into account the opposing views of the divided circuits.

Finally, though the requirements of § 2244(b)(2)(B)(i) and (ii) are prerequisites to consideration of the merits of a petitioner's alleged constitutional claims, the alleged newly discovered factual predicates asserted must at least be tethered or linked to the asserted constitutional claims. *Herrara v. Collins*, 506 U.S. 390, 417 (1993). Stated differently, as Ross himself acknowledges, "evidence warranting habeas relief must bear upon the constitutionality

of the appellant's detention; evidence merely of newly discovered evidence relevant to guilt of a state prisoner is not a ground for relief on federal habeas corpus." Opp. to Mot. to Dismiss [10] at 29; *see also Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013).

## IV. The Motion to Dismiss

In its Motion to Dismiss, the State contends Ross cannot meet either of the showings required under § 2244(b)(2)(B)(i) or (ii) before this court may consider the merits of his successive petition. In the alternative, and assuming the court were to find Ross had met the prerequisites of § 2244(b)(2)(B)(i) and (ii), the State asserts the petition should be dismissed pursuant to § 2244(d) for failure to comply with the habeas statute's one-year limitation period.[3]

With respect to the required showings for the factual predicates underpinning his constitutional claims, the State alleges the information Ross asserts as newly discovered "has been readily available for years," and that, even in the absence of Hayne's testimony at trial, no reasonable juror could have found Ross not guilty. But, like Ross in his Opposition to the Motion to Dismiss [10], the State makes little effort to specifically evaluate each of Ross's alleged newly discovered factual predicates and the evidence offered in support against the requisite standards of § 2244(b)(2)(B)(i) and (ii).[4] Nonetheless, this court is obligated to do so. It must make a thorough – admittedly tedious – analysis in order to independently determine whether any factual predicate on which Ross relies actually satisfies the stringent § 2244(b)(2)(B)(i) and (ii) requirements. Specifically, the court must evaluate:

---

[3] "(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-- … (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

[4] The State does, however, helpfully organize by factual predicate the dates of publication of nearly all the alleged evidence on which Ross relies.

(1) Whether the tangible item of evidence or information contained therein/factual predicate offered by Ross was known to Ross or his criminal counsel prior to the date on which he first filed/amended his prior habeas petition; and if not, was it nevertheless, in the exercise of due diligence, discoverable by them by either of those dates?

(2) Whether the tangible item of evidence or information contained therein/factual predicate is at least tethered or linked to Ross's asserted constitutional claims. For example, Ross's constitutional claims are each premised on the State's alleged failure to disclose to him either exculpatory or impeaching evidence for use at his 2002 trial. Given the nature of these constitutional claims, documents,  or information contained therein that was indisputably non-existent (not just undiscovered) and thus unavailable to anyone until well after Ross's trial, can hardly be sufficiently tethered to his constitutional claims so as to qualify for a merits review of his successive habeas petition.

(3) Whether the newly discovered factual predicate/evidence, if assumed to be true and viewed in light of all the evidence, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact finder would have found Ross guilty of the underlying offense.

## V. The Analysis

### A.  Factual Predicate #1: The alleged unethical business relationship between Hayne and the State.

For this predicate, Ross primarily relies on a letter from the Department of Public Safety to the Mississippi Ethics Commission, dated ***July 2, 1992***, (App. 7 to Ross's Pet.)[5] and the Advisory Opinion of the Mississippi Ethics Commission, dated ***July 10, 1992*** (App. 19). Ross contends these letters provide details of an unethical business arrangement between Hayne and

---

[5] All references hereafter to Appendices to Ross's Petition appear as "App. #."

the State, unknown prior to 2012, when the letters were discovered during civil litigation between Hayne and the Innocence Project.[6] According to Ross, this correspondence specifically outlines a business plan between the State and Hayne, designed to shift the bulk of the state's fee based autopsy work to Hayne who would serve as both the State Medical Examiner (hereafter "SME") and a designated state pathologist. Ross claims the Ethics Commission pointed out, in response to notice of this proposed plan, that it raised grave ethical issues.  But, Ross asserts the State and Hayne went ahead with the plan anyway. *See* Opp. to Mot. to Dismiss [10] at 14. As a result, Ross argues Hayne was allowed to perform an astronomical number of autopsies annually and to serve in an official state role, even though he did not have the statutorily required certification from the American Board of Pathology (ABP) in forensic pathology to hold such an official state position (that of SME).

Having examined the letters, the court first notes Ross's assertion that the State "went ahead anyway," with the alleged unethical business relationship described in the letters despite the Ethic's Commission's concern is simply demonstratively inaccurate. The letters discuss a proposed relationship between the State and Hayne, pursuant to which Hayne would serve as SME without a salary.  His position would include that office's statutorily described rights and duties.  He would also continue to serve as a designated state pathologist – a positon he *already* held pursuant to Mississippi Code Annotated  § 41-61-65 and pursuant to which he *already* performed over 1000 autopsies annually at the  request of the state's coroners for an *already* statutorily mandated fee per autopsy. Nothing in the record suggests that Hayne and the State ever "went ahead" with this proposed relationship. On the contrary, and as was conceded by Ross's counsel at the recent hearing in this matter, Hayne was never thereafter appointed SME

---

[6] This was a civil lawsuit by Hayne against The Innocence Project for defamation.  It has since been resolved by settlement.

and never assumed the office's statutory obligations/powers as had been envisioned in the letters.[7] Consequently, the principal ethical concern the Commission appears to have addressed in response to the Commissioner of Public Safety's proposal – the concern that as SME Hayne would be obligated to promulgate the very rules by which he, in the dual role of state designated pathologist, would have to adhere to – never transpired. Since Hayne did not, in fact, assume the position of SME, he also did not, as Ross alleges, do so without the statutorily required certification from the ABP. Hayne, instead, continued to perform autopsies only as a state designated pathologist as provided for by statute through the time of Ross's trial in 2002. Notably, the Ethics Commission offered no criticism whatsoever of the actual business relationship between Hayne and the State described in detail in the letters.

It is further uncontested that the details of Hayne's actual relationship with the state were well-known both at the time of Ross's trial and available to Ross prior to filing his first habeas petition and its 2005 amendment. Indeed, Hayne testified at Ross's trial to performing on average over 1,000 autopsies annually under the auspices of the Department of Public Safety. In short, Ross has not clearly and convincingly established that, but for the state's failure to disclose the subject letters in alleged violation of *Brady* and the Confrontation Clause, a reasonable juror could not have found Ross guilty. In fact, if the letters had been disclosed to Ross's jury, as they contain a number of laudable comments about Hayne by the Commissioner of Public Safety, they would likely have only served to bolster Hayne's credibility.

A *Clarion Ledger* article by Jerry Mitchell, dated ***April 27, 2008***, (App. 2) is also cited by Ross in support of the unethical business relationship allegation. However, that article merely recites – as relates to Haynes's relationship with the state – that Hayne has formerly testified he

---

[7] For an earlier brief period, Hayne did serve as an interim acting SME when the position was unexpectedly vacated by the officially appointed SME. No allegation is made by Ross that such service was unethical.

is "chief state pathologist;" he performs in excess of 1,500 autopsies a year for a fee of $550 per autopsy; and at that time, the State had been without a SME for years. With the exception of the testimony regarding the title "chief state pathologist," it is uncontested that all of this information was well-known prior to Ross's first habeas petition. The fee per autopsy was set by statute, the number of autopsies Hayne performs annually was testified to at Ross's trial, and that the state had not filled, for some years, the office of SME was widely known and written about. As for the title "chief state pathologist," Hayne was not given that title until 2006. *See* Letter from the Mississippi Department of Public Safety to Merrida Coxwell, Esq., dated **January 27, 2006** (App. 22). Consequently, the failure to disclose this letter to Ross at his trial could hardly be linked to his constitutional *Brady, Napue* and Confrontation Clause claims. Moreover, the fact that, at some point years after Ross's trial, the State agreed to allow Hayne to refer to himself as a "chief state pathologist" does nothing to detract from Ross's guilt.

A *Clarion Ledger* article by Butch John, dated **March 22, 1999**, (App. 6) does not actually discuss Hayne's relationship with the State – other than to recite he and another state designated pathologist were doing most of the state's autopsies in 1999. Not only was this information indisputably well-known as of Ross's first habeas petition, it does nothing to advance Ross's innocence. On the contrary, it suggests Hayne was well regarded among the state's many coroners.

A *Commercial Appeal* article dated **July 20, 1998**, (App. 14) similarly does not address Hayne's relationship with the state or the office of the SME. Instead, it is an article about the need to fill the directorship of the State Crime Lab.

A Letter from the College of American Pathologists Inquiry Committee to the President of the College of American Pathologists dated **August 20, 2008**, (App. 4) is of no greater aid to

Ross. This letter is critical of the volume of autopsies performed annually by Hayne (the number of which Hayne testified to at Ross's trial (App. 5 at p.1024)) and notes that, as of 2007, Hayne had a contract with the Department of Public Safety pursuant to which he was given the title "Chief State Pathologist." But, it does not address any particulars of Hayne's relationship with the State. Moreover, the letter recites "…none of the evidence currently before the committee specifically indicates that the volume of autopsies performed by Dr. Hayne has resulted in inadequate care" and "no action which would adversely affect Dr. Hayne's membership in the college be taken at this time." Further, the letter itself and the fact that, as is discussed in the letter, an investigation of Hayne was made by the College Of American Pathologists in 2008 could hardly underpin a *Brady, Napue* or Confrontation Clause challenge by Ross. This letter was non-existent as of 2002 when Ross's case was tried, and the information contained in the letter, with the exception of the historical volume of autopsies performed annually by Hayne (itself testified to at Ross's trial), did not exist. It could not have been suppressed at Ross's trial. Absent at least some link to an alleged constitutional violation, Ross cannot establish that, but for the evidence's suppression having given rise to his constitutional claims, no reasonable juror could have found him guilty.

Though Ross references a letter to "fellow coroners" from Michael West dated ***January 25, 1995***, (App. 16), it does not actually mention Hayne. Instead, it describes complaints of a majority of the state's coroners over the job performance of the then SME (not Hayne) and seeks to, by petition of the legislature, have the office of SME eliminated. Obviously, any such petition would have been available to the public, including Ross and his counsel, upon its filing. Further, nothing about the letter serves to impeach Hayne or provide Ross exculpatory proof. It does not

clearly and convincingly establish that, but for the letter's alleged unconstitutional non-disclosure by the State, no reasonable juror would have found Ross guilty.

An open letter from Michael West to the American Board of Forensic Odontology, dated *June 15, 2006*, (App. 18) is also devoid of any reference to Hayne's relationship with the State, other than to identify Hayne as a state designated pathologist. Since neither the letter nor the primary subject matter it addresses even existed as of Ross's trial, neither this letter nor its contents could conceivably have been disclosed to Ross or his counsel when he was tried in 2002. Thus, again, Ross cannot show that, but for an unconstitutional non-disclosure of the information, a reasonable juror would not have found Ross guilty.

Ross's reference to a letter from the Mississippi Department of Public Safety to Merrida Coxwell, Esq., dated *January 27, 2008*, (App. 22) likewise does not address the State's relationship with Hayne as of Ross's 2002 trial. Instead, it contains an unrelated explanation by the Department of Public Safety in response to an inquiry by a lawyer for an undisclosed client in 2006. The Department explains that Hayne had a contract with the Department of Public Safety beginning in 2006 to perform autopsies as an independent contractor, not as a state employee. This arrangement bestowed on Hayne what the Department termed an "honorific" title, "Chief State Pathologist." Since these matters postdate Ross's 2002 trial by years, no one could have conceivably disclosed them to Ross or his counsel when he was tried. Thus, Ross cannot show that, but for an alleged unconstitutional non-disclosure of the information, a reasonable juror would not have found him guilty.

The Joint Legislative Committee Report "An Evaluation of Mississippi's Medicolegal Death Investigation Process (App. 1) was not prepared until 2008. Consequently, Ross may not credibly assert it was unconstitutionally suppressed at his trial. Further, the only material

information in the report which would have existed as of Ross's trial in 2002 were the facts that: (1) since 1995, the office of SME had been vacant; (2) since 1995, autopsies had been performed by state designated pathologists approved by the office of the SME (of which Hayne was one); (3) the salary for the SME position was, until fiscal year 2009, inadequately or unfunded by the legislature; and (4) Hayne performed nearly all the autopsies in the state (approximately 1,600 per year). Most significantly, this article also discussed the fact that Hayne's annual production rate was well in excess of the 250 approved by National Association of Medical Examiners (NAME). The NAME standard has, however, been adopted since 1997 and published since at least 2001. *See* App. 9 (selection from text DiMaio and DiMaio, *Forensic Pathology*). Such a standard was, with due diligence, available to Ross and his counsel, who themselves employed an expert in forensic pathology to testify at Ross's trial. In addition, Hayne actually testified at Ross's trial to the large number of autopsies he performed annually.

The "Forensic Autopsy Performance Standards" by the National Association of Medical Examiners, preface dated ***August 12, 2005***, (App. 8) is cited by Ross for the NAME standard discussed above. As noted, demonstrably, this standard was published and available to Ross with due diligence before he filed his initial habeas petition.

The Autopsy Report of Randy Cheney, dated ***August 30, 2007***, (App. 11) was prepared by Hayne five years after Ross's trial. It, like so much of the other information Ross offers to support his constitutional claims, cannot credibly form the basis for them. When Ross was tried, Randy Cheney was alive and well. There are simply no circumstances under which the State, Hayne, or anyone else could have disclosed the information in the Cheney Autopsy Report for Ross's use at his trial. And, to state the obvious, the autopsy speaks not at all to the nature of the alleged unethical business relationship between Hayne and the State.

The medical records for Randy Cheney, dated **December 15, 2003**, (App. 12) also do not speak to the factual predicate for which Ross cites them.  They are plainly immaterial to the constitutional claims Ross makes in the instant case.

Ross's reference to the partial testimony of Hayne in *State v. Brown*, 970 So.2d 1300 (Miss. Ct. App. 2007), Mississippi Court of Appeals Cause No. 2006-KA-00717-CO (App. 23) is simply another occasion in which Hayne – as he did in Ross's trial – testified to performing approximately 1,000 or more autopsies annually. Since this is the same testimony Hayne gave at Ross's trial, it adds nothing to Ross's constitutional claims and was most assuredly known by Ross when he filed his initial habeas petition.

The portion of Hayne's testimony in *State v. Bennett*, 933 So.2d 930 (Miss. **2006**), *reh'g denied* August 3, 2006, Mississippi Supreme Court Cause No. 2003-DP-00765-SCT (App. 24) is yet another example of Hayne being cross-examined about the number of autopsies he performs annually and the fact that that number exceeds by many multiples the standard adopted by NAME.  As discussed above, there is nothing newly discovered about this information. Moreover, Hayne does not testify untruthfully about the NAME standard in the *Bennett* case; he simply states he disagrees with it.

The deposition of Hayne in Cause No. 63:09cv218-KS-LRA, dated **April 26, 2012**, (App. 10)  does not, aside from mentioning the statutorily set fee per autopsy charged in Mississippi, concern the alleged unethical business relationship between Hayne and the State in 2002. Rather, most of the testimony concerns Hayne's certifications and licenses from various entities and the fact that Hayne failed the ABP exam in 1998, including a discussion of the reason he gives for having failed. The reason for Hayne's failure of the ABP in 1989 is a separate factual predicate and is discussed below.

The Affidavit of W. Tucker Carrington, Director of the Mississippi Innocence Project, dated *September 27, 2012*, (App. 13) references cases from 1997, 1998, and 1999, but it does not address any aspect of Hayne's relationship – business or otherwise – with the State. Instead, the affiant states that some unnamed person told him "several years ago" that he had once represented a man who was involved in killing a man who Hayne misidentified on autopsy as having ovaries. According to the affiant, the unnamed attorney would not himself attest to these facts because he had recently *himself retained Hayne as an expert*. The affiant also states he heard from another unnamed attorney, in another case where the manner of death was not an issue, that Hayne had improperly identified the deceased as having two kidneys when medical records indicated one had earlier been removed. Given the obvious multiple evidentiary problems with such testimony, it certainly does not clearly and convincingly establish Ross's innocence. Moreover, it does not even purport to speak to Hayne's alleged unethical business relationship with the state.

The Deposition of Cecil McCrory in Cause No. 3:09cv218-KS-LRA, dated *April 24, 2012*, (App. 20) could not have been suppressed at Ross's trial in 2002, and nothing in the cited testimony speaks to Hayne's relationship with the state in 2002.

The Calendar dated *April 26, 2012*, reflecting the number of autopsies performed by Hayne in **2007-2008**, (App. 21) obviously could not have been suppressed at Ross's 2002 trial. Further, the  information reflected in the calendars (that Hayne performed well in excess of 1,000 autopsy's annually at the request of the state's coroners) is not materially different from that which Hayne testified to at Ross's trial.

**B. Factual Predicate #2:  Hayne testified falsely at Ross's trial (and previously) to being board certified in forensic pathology.**

A *Clarion Ledger* Article by Jerry Mitchell, dated ***April 27, 2008***, (App. 2) to which Ross cites for this factual predicate cannot, even if constituting admissible evidence, be linked to a claim of unconstitutional suppression at Ross's trial in 2002, given its publication date. And, even though the information contained in the article might well have existed as of 2002, and then might be linked by Ross to a claim of unconstitutionally suppression, the fact that the article reports Hayne is not certified by the American Board of Pathologists (ABP) in forensic pathology, but instead received a certification by the American Board Forensic Pathologists (AFBP) in 1992, is hardly new information. Hayne, for example, testified in *Bennet v. City of Canton Swimming Pool*, Madison County Circuit Court No. CI-9600176, dated ***June 2, 2001***, (App. 28) on this subject. Similarly as the article reports, the fact that the AFBP ceased to exist by 1995 or 1996 is not new information, nor is it the type of information that Ross – with his own expert in forensic pathology – could not have learned with due diligence before his trial in 2002 or before he filed or amended his initial habeas petition in 2005. The article's additional notation that the AFBP was not the "gold standard" for medical board certification in forensic pathology is also not new. An interested party could easily have explored this subject in advance of Ross's trial. Furthermore, Ross himself cites to authorities predating his trial wherein Hayne testified accurately that: he was not board certified by the ABP; the certification he had in forensic pathology was from the ABFP; and that organization no longer issued certifications in forensic pathology. *Id.*; *see also* Dep. of Hayne, ***August 23, 2001***, from *Lewis v. Brown*, Sunflower County Circuit Court Cause No. 99-0476 (App. 36).

A letter to the Office of Capital Defense Counsel of the American Academy of Neurological and Orthopedic Surgeons (AANOS) dated ***May 18, 2010***, (App. 33) is from the Executive Director of that organization, Nick Rebel. The letter verifies Hayne was board

certified in forensic pathology by the AFBP (a subset of the AANOS) in 1992. According to

Ross, the letter also states Hayne's certification was only good for five years (until 1997); after

that date, Hayne would have to be re-certified; and Hayne could not have been re-certified

because the AFBP board ceased to exist in 1996. Thus, Ross argues Hayne falsely testified at

Ross's 2002 trial (and earlier) that he was so certified.

Ross's assertions aside, the letter simply confirms Hayne was certified in 1992 and that

that certifying Board ceased to exist in 1996. While the letter does explain that "all the active

AANOS affiliated boards currently require recertification every five years," it does not state that,

at a time during which the board that certified Hayne was in existence, *that* board required

recertification every five years. It also does not state the consequences of a cessation of that

board's existence prior to the date for recertification, if any were required. Moreover, as

discussed above, anyone desiring to do so could easily have learned that the Board that certified

Hayne no longer existed after 1996, as well as the conditions, if any, of a certification from that

board.

Ross also cites to a letter from American Board of Medical Specialties to a Dr. Emily

Ward dated **June 18, 1996**, (App. 34), which notes that the American Board of Forensic

Pathology (the AFBP) is not recognized by the American Board of Medical Specialties.

However, as the State points out, the letter's author noted "self-designated" boards exist which

offer certification in certain specialties. In other words, the mere fact the board through which

Hayne obtained his certification was not authorized by the American Board of Medical

Specialties but, instead the AANOS, does not render his certification a nullity. And, Ross offers

no explanation why he, with the assistance of an expert in pathology and legal counsel, could not

have easily discovered this information for his trial. Moreover, Hayne did not testify at Ross's

trial to being certified by a board approved by the American Board of Medical Specialties.  In short,  the undersigned is unpersuaded a reasonable juror, even upon learning Hayne's certification in forensic pathology had come from the AFBP rather than the ABP, or that the issuing board no longer existed so as to allow for recertification (assuming it was, in fact, required) would have his/her opinion concerning Ross's guilt swayed. The asserted distinctions of one certifying board over another do not amount to clear and convincing proof, when viewed against the whole of the proof, that but for a constitutional violation arising from non-disclosure of the subject information, no reasonable juror could have found Ross guilty. Indeed, Ross's own expert in forensic pathology apparently did not think it significant enough to even raise this point.

Another letter to the Office of Capital Defense Counsel from the Executive Director of the American Academy of Neurological and Orthopedic Surgeons (AANOS), dated ***August 17, 2010***, (App. 35) addresses the question of whether Hayne is "currently" board certified in forensic pathology by this organization. Rather than, as Ross contends, stating affirmatively Hayne cannot truthfully claim to be board certified in forensic pathology as a consequence of the certification he received in 1992 from the now non-existent AFBP, the Director writes:

> As I previously stated in my letter of May 18, 2010, Dr. Hayne was indeed certified in Forensic Pathology in 1992. At this time the AANOS does not support this specialty board [the ABFP] and re-certification is not possible through our organization in Forensic Pathology.  You ask that I provide an indication of whether or not Dr. Hayne is currently board certified in Forensic Pathology by the AANOS. I suspect that the term "currently" implies that the certification must be from an organization that at present offers such certifications. Based on that definition, Dr. Hayne might not be considered "currently" board certified in Forensic Pathology.

In other words, the AANOS only acknowledges there is perhaps some question as to whether Hayne can be considered "currently" board certified in forensic pathology by that

organization. The court also finds it noteworthy that Ross' own pathology expert, Dr. James

Bryant, was not certified in forensic pathology by any board.


**C. Factual Predicate #3: Prior to Ross's trial, Hayne testified falsely about the**

**circumstances surrounding the fact that he failed the American Board of Pathology (ABP)**

**certification exam in 1989.**

A portion of Dr. Hayne's testimony from *Austin v. State*, 860 So.2d 1224 (Miss. Ct. App.

**2003**), *reh'g. denied* December 9, 2003, Mississippi Court of Appeals Cause No. 2001-KA-

00920-COA (App. 25) is cited by Ross to support this factual predicate, but the cited testimony

does not actually address that subject.

Ross's reliance on *Fuqua v. State*, 938 So. 2d 277 (Miss. Ct. App. 2006), *reh'g. denied*

June 27, 2006, Mississippi Court of Appeals Cause No. 2004-KA-00491-COA (App. 26)  is also

misplaced as that testimony is unrelated to the circumstances concerning Hayne's failure of the

ABP exam  in 1989.

On the other hand, a portion of Hayne's testimony from civil case *Vessell v. Alleman*,

Mississippi Supreme Court Cause No. 2000-AC-450, Warren County Chancery Court Cause No.

99-0307-CI-V, (App. 27) is an example of an occasion, prior to Ross's trial, when Hayne was

questioned about the circumstances of his failure to pass the ABP exam. On this occasion, he

testified as he did any time he was asked about the subject. He asserted he had not passed the

exam because he walked out of it due to its inclusion of an absurd question related to the colors

of death.  This testimony is not relevant to Ross's case.  Hayne did not testify at Ross's trial, nor

was he asked about whether or why he had not passed the 1989 ABP exam. He was not asked

*any* question about the ABP exam or about certification by that board. Moreover, according to

Ross, no one other than Hayne and the ABP could have conceivably proven Hayne's oft repeated death colors explanation (in cases where he was asked about it) was false until 2012. Under these circumstances, Ross cannot sufficiently tether this alleged newly discovered evidence to his *Brady, Napue* and Confrontation Clause constitutional claims. He can't credibly assert the State had anything to disclose to him in 2002 regarding why Hayne failed the ABP exam. In short, he cannot clearly establish that, but for a constitutional violation arising therefrom, no reasonable juror could have found him guilty.

Ross's reliance on the excerpt of Hayne's testimony in *Bennet v. City of Canton Swimming Pool*, Madison County Circuit Court No. CI-9600176, **June 2, 2001**, (App. 28) regarding why he failed the ABP exam in 1989, fares no better for the same reasons discussed above in reference to Appendix 27.

Hayne's testimony from *Williams v. State*, 964 So.2d 541 (Miss.Ct.App. 2007), *reh'g. denied* September 18, 2007, Mississippi Court of Appeals Cause No. 2005-KA-00109-COA) (App. 30) to the effect that he walked out of the ABP exam because it contained the absurd death colors question, similarly does not satisfy the 2244b(2)B(i) and (ii) standards for the reasons discussed above with respect to Appendices 27 and 28.

Ross cites to a Clarion Ledger Article by Jerry Mitchell, dated **April 27, 2008**, (App. 2) for the statement that the ABP reported in 2008 that Hayne's oft cited death colors explanation for having failed the ABP exam was false and that Hayne had responded that the ABP was "flat wrong." Leaving aside the obvious admissibility issues concerning such articles, Ross offers no explanation as to how the state could have suppressed evidence on a subject matter not even addressed at his trial, and which Ross himself contends was unknown to anyone for years after his trial and unprovable until 2012. Again, absent some link between the asserted new evidence

and a claimed constitutional violation, Ross cannot clearly establish that, but for a constitutional violation at his trial, no reasonable jury could have found him guilty.

Citing a portion of a deposition of Hayne from *Hand v. Fabianke*, Franklin County, Alabama Circuit Court Cause No, 03-234, **May 14, 2004**, (App. 31) and an affidavit of William M. McIntosh regarding his review of the *Hand v. Fabianke* Case, **October 17, 2012**,  (App. 32), Ross asserts Hayne testified falsely that he had never failed any board exam.  This testimony, having been non-existent as of Ross's trial and covering a subject not addressed at  Ross's trial, is not sufficiently tethered to Ross's alleged *Brady, Napue*, or Confrontation Clause claims. Thus, Ross cannot establish that, but for such a constitutional violation occasioned by its non-disclosure, no reasonable juror could have found him guilty.

### D. Factual Predicate #4: Hayne testified falsely at Ross's trial (and previously) he was board certified or had the equivalent of board certification in forensic medicine (as distinct from forensic pathology).

For this factual predicate Ross cites an article by Leah Bartos from ProPublica, dated ***April 17, 2012***, (App. 37)  critical of  the ACFEI, the organization on which Hayne relies for his repeated claim – made also at Ross's trial – that he is board certified in forensic medicine (as distinct from pathology).  According to the article, many prior employees of the organization have complained it is a "certificate mill;" has an underwhelming certification exam; and that Hayne is among the controversial recipients of a certificate from the organization. This 2012 article obviously could not have been suppressed at Ross's 2002 trial.  If it is assumed the information contained therein did exist at that time, Ross makes no effort to explain why he, his counsel, and his expert could not easily have explored the organization's reputation in advance of his trial. Indeed, Hayne's C.V. lists the ACFEI as a certifying board and exploration of the

bona fides of an expert's credentials is routine trial preparation. Furthermore, even if this article or its contents were introduced at Ross's trial, the undersigned remains unconvinced it would have affected Ross's guilty verdict. Apparently, Ross's counsel and his expert shared the view that arguments over the merits of one certifying board over another are often lost on lay jurors — they did not go near the subject at Ross's trial.

Ross also cites to a request for an Attorney General's Opinion by Hayne, dated **May 6, 2010**, to support this factual predicate, but why he does so is unclear. The request includes a copy of the actual certificate Hayne received from the ACFEI in 1992 in forensic medicine which recites it is "board certified identification number 701."

Ross relies on an email exchange between John Lechliter and Radley Balko, dated **March 26, 2008** (App. 39) also in support of this factual predicate. This email explains that ACFEI certifications "are rigorously verified to meet the standards of our governing boards…any certificate is limited in nature and relevant to specific circumstances. Being a fellow with the ACFEI is a high honor recognizing significant experience and training, but it is different from being certified in pathology." Hayne did not testify at Ross's trial that he was board certified in forensic pathology from the ACFEI but, rather, that he was certified by it in forensic medicine. As such, the court is unpersuaded the introduction of this letter would clearly and convincingly have resulted in no reasonable juror finding Ross guilty. Moreover, this information could certainly have been easily discovered by Ross and his counsel prior to his habeas petition. Again, Hayne's C.V. produced in Ross's case identified the ACFEI as the organization certifying him in forensic medicine.

**E. Factual Predicate #5: Hayne testified falsely prior to Ross's trial that he had undertaken certain professional and scholarly activities**.

Ross relies on a comparison of the *Curriculum Vitae* of Hayne, date stamped **March 13, 2001**, (App. 40) with the *Curriculum Vitae* of Dr. Michael West (West), dated **March 30, 2006**, (App. 41) to show both physicians claim credit for many of the same publications even though West, not Hayne, actually appears as the author/presenter on the materials themselves. Yet, it is obvious that reviewing the claimed articles and presentations themselves (as is routinely done in preparation for examination of an expert witness) would have revealed this information.

Furthermore, Ross cites to an affidavit of West dated in 2001 (App. 42), in which West asserts that even though he appears as the only author/presenter on the face of the various publications and presentations, Hayne could properly take credit for them on his C.V. as well.

**F. Factual Predicate #6: Hayne testified falsely prior to Ross's trial to certain educational accomplishments.**

To support this factual predicate, Ross relies on Hayne's testimony in *Williams v. State*, 964 So.2d 541 (Miss. Ct. App. 2007), *reh'g. denied* September 18, 2007, Mississippi Court of Appeals Cause No. 2005-KA-00109-COA (App. 30). Hayne testified in that case that he carried 39 credits in undergraduate school while maintaining a straight-A average. Ross also cites Haynes's testimony in *Vessell v. Alleman*, Mississippi Supreme Court Cause No. 2000-AC-450, Warren County Chancery Court Cause No. 99-0307-CI, dated **June 26, 2003**, (App. 27), where Hayne testified he received academic honors in undergraduate school. Ross contends all of this testimony was false as evidenced by Hayne's undergraduate record filed under seal (App.43), and a letter from the University of North Dakota University Registrar to the Innocence Project, dated **February 13, 2012**, (App. 44). The undergraduate record, covering semesters between 1969 and 1972 and reflecting good grades (mostly A's, a few C's), does not reflect straight A's or a 39 credit hour load. The letter from North Dakota University reflects for the period of his

attendance there (the fall of 1972 through the spring of 1974), the university has no record of any academic honors being awarded to Hayne. However, the court notes that both the undergraduate record and University letter reflect that Hayne attended other academic institutions in undergraduate school and no records from those institutions are provided. Of more importance, Hayne was not questioned at Ross's trial about his undergraduate work (predating Ross's trial by 30 years.) Ross simply cannot with any credibility assert that Hayne's undergraduate record was either exculpatory or suppressed by the State in Ross's trial. Finally, if Ross was able to obtain these records in 2012, then certainly he could, with due diligence, have obtained them prior to the filing /amendment of his original habeas petition.

**G. Factual Predicate #7: Hayne testified prior to Ross's trial that, based on an autopsy alone, he would only be able to speculate as to the angle between a shooter and a victim, but he unqualifiedly testified at Ross's trial to his ability to determine the precise angle of the gun relative to Deidre's head when she was shot**.

For this factual predicate, Ross relies on testimony Hayne gave in *Young v. State*, 731 So.2d 1145 (Miss. 1999), Mississippi Supreme Court Cause No. 97-CP-00162-SCT (App. 50). Hayne testified in that trial that, based on autopsy alone, all he could testify to was the trajectory of the bullet through the victim's head – not the position of the shooter or the deceased's head when shot. However, Ross offers no explanation of why he or his counsel could not, in the exercise of due diligence, have discovered this testimony prior to Ross's trial or initial habeas petition. Moreover, disclosure of this prior testimony would not clearly and convincingly have resulted in no reasonable juror being able to find Ross guilty. Among other reasons, this testimony does not contradict Hayne's ballistic testimony in Ross's case. At Ross's trial, Hayne never testified to what position Ross was in or what position Deidre Ross's head was actually in

when the fatal shot was fired. Instead, Hayne testified that with the body in an anatomically correct position, such as on autopsy, the gun would have been above and to the rear of the ear slightly down and forward based on the bullet's trajectory and distance of the muzzle from Deidre's head. *See* App. 10 at Pp. 276, 277, and 404.

**H. Factual Predicate #8: Hayne testified prior to Ross's trial that he was only able to speculate as to a bullet's trajectory through a person's body, but nevertheless testified unqualifiedly at Ross's trial that he was able to ascertain the actual trajectory of the bullet that killed Deidre Ross.**

Here again, Ross relies on a portion of the transcript from *Young v. State*, 731 So.2d 1145 (Miss. 1999), Mississippi Supreme Court Cause No. 97-CP-00162-SCT, (App. 50). Ross cites specifically to Hayne's alleged testimony in that case "that after the first inch or inch and one half, the bullet path inaccurately reflects the bullet's trajectory" because "bullets can deviate and change their direction, especially after they hit a bony structure" Pet. [1] at 71 n. 281. On review of the actual testimony, however, the court notes Hayne was not so definitive. He stated in that case only the most important aspect of the determination of a bullet's path is looking at the first inch to inch and a half of the wound track itself because bullets can deviate direction especially after hitting a bony structure. Concerning this testimony, the undersigned notes Hayne did not testify at Ross's trial that he had treated the first 1-1.5 inches of the bullet wound to Deidre as other than the most important in arriving at his trajectory opinion, and/or that in Deidre's case, the bullet's trajectory was actually ever diverted. In short, this testimony does not suggest, much less clearly establish, that but for an unconstitutional non-disclosure of it at Ross's trial, no reasonable juror could have found Ross guilty.

Further, this prior testimony was available to Ross prior to trial or when his initial habeas petition was filed/amended with due diligence. Counselors routinely scour an adverse expert's prior testimony to obtain fodder for cross examination.

Ross also relies on an excerpt from "Vincent J.M. DiMaio, Gunshot Wounds 53 (2ⁿᵈ ed. 1999), dated by Ross from *1999* (App. 52), said to have been frequently cited by forensic pathologists, including Hayne. Specifically, Ross asserts this treatise cautions: "Exact calculation of the angle that the bullet travelled through the body is not possible and is misleading…" This testimony necessarily either merely reflects one forensic expert's views on the subject matter (the author's), or it reflects a widely held view among forensic pathologists. Neither avails Ross of anything since in the event of the former, non-disclosure of such a singularly held opinion could not give rise to a *Brady, Napue*, or Confrontation Clause violation. If it was instead a widely held view among pathologists, it was indisputably available, with due diligence, to Ross, his counsel and his expert prior to Ross's trial or filing/amending of his initial habeas petition. Moreover, even if this opinion evidence had been offered at Ross's trial, there is nothing to suggest it would have, in view of all the evidence, clearly and convincingly established Ross's innocence. As is discussed below, even if Hayne had never testified at all at Ross's trial, there was clearly adequate ground to have found Ross guilty.

**I. Factual Predicate #9: Hayne testified falsely at Ross's trial that, in his opinion, the gun that killed Deidra Ross was pointed at a certain angle relative to the entrance wound; that the gun that killed Deidre was at a certain distance from her body when she was shot; and that the bullet travelled a certain trajectory on entering her body.** [8]

---

[8] Ross further contends that all of these ballistics opinions were (aside from being false), "unsupported, untested, and inadmissible as a matter of law." These contentions were not authorized by the Fifth Circuit panel to be made in this court. The Fifth Circuit panel expressly stated that evidentiary errors made by the trial court concerning the reliability of Haynes's testimony or arguments that Hayne's practices were not sufficiently based in science for him

In addition to asserting that Hayne gave false testimony at Ross's trial concerning his ability to access a bullet's trajectory or the angle of a gun upon firing, Ross also claims in his successive petition that he has newly learned Hayne's opinions as to that trajectory, the gun's angle, and its distance from Deidre when discharged were themselves false. However, at the recent hearing in this matter, Ross's counsel acknowledged inasmuch as Hayne's testimony on these matters was in the form of expert *opinion,* while perhaps unsupported or ill founded, it could not be false testimony unless it were shown that Hayne did not actually hold such opinions. Aside from the prior testimony addressed above regarding Hayne's ability to determine the trajectory of a bullet or angle of a gun upon firing, Ross offers no evidence to support a contention that the ballistics opinions Hayne asserted as trial were not, in fact, his opinions.

Despite these concessions by Ross's counsel and observations by the court, out of an abundance of caution, the undersigned has nevertheless examined the evidence cited in Ross's successive petition, and not already addressed herein, for the proposition that Hayne's ballistic opinions given at Ross's trial were false:

Haynes's *Curriculum Vitae*, date stamped **March 13, 2001**, (App. 40) is cited by Ross as illustrative of the fact that Hayne had no formal ballistics training. Ross cannot establish that this information was, in the exercise of due diligence, unknown to him at his trial. On the contrary, Haynes' C.V. was produced in discovery in Ross's case; Hayne was deposed in the case; Hayne was cross examined at Ross' trial; and Ross himself retained a forensic pathology expert who did not challenge Hayne's ballistics testimony. Moreover, as noted earlier, the fact that Hayne's C.V. may not reflect formal ballistics training does not, even if it undermines the reliability of

---

to have formed a reliable opinion were not before the panel. Thus, such claims are not properly asserted here. At the recent hearing in this matter, Ross's counsel conceded as much.

Hayne's ballistics' testimony, speak to whether Hayne's opinions on the subject were false – that is: not actually his opinions.

Ross also cites, *Dudley v. State*, 719 So. 2d 180 (Miss. 1998), Mississippi Supreme Court Cause No. 97-KA-00601-SCT, (App. 53) ***August 20, 1998***, as proof that Hayne's ballistic opinion testimony in Ross's case was false. In that case, Hayne testified he was not a firearms expert, but he had training in the use of firearms and "goes to a conclusion one degree less than a firearms expert would make." He testified that because he has recovered so many projectiles while performing over 1,500-2,000 autopsies annually for approximately 20 years, he has some understanding of metalogy of projectiles, the coatings, and the different type of projectiles. He testified further that he periodically testifies to the caliber or type of bullet found during an autopsy but leaves the final and official comparison to the firearms division of the State Crime Lab.

Since this transcript was available for review by Ross and his counsel for four years before his trial, it would have been discoverable, in the exercise of due diligence, prior to Ross's trial and initial habeas filing/amendment. This is demonstrated by the fact that an intern for the Mississippi Innocence Project obtained it more recently with every other published or known case in which Hayne testified. *See* Aff. of Kimberly Taylor [10-5]. Even more clearly though, this evidence and the factual predicate it is said to support does not clearly and convincingly establish that, but for a constitutional violation charged by Ross and occasioned by the suppression or non- disclosure of this testimony, no reasonable juror would have found Ross guilty. Indeed, Ross does not even suggest how this prior testimony contradicts Hayne's testimony in Ross's case on the subject of caliber and metology of the bullet that killed Deidre

Ross. And having thoroughly reviewed Hayne's testimony at Ross's trial, the undersigned can find no apparent contradiction.

Ross' reliance on *Boyd v. State*, 977 So. 2d 329 (Miss. **2008**), Mississippi Supreme Court Cause No. 2006-KA-00562-SCT (App. 56) is equally unavailing. In that case, Hayne testified a gunshot was "distant and near contact," a term he described as meaning a muzzle was anywhere from one-half inch to fifty feet from a victim when discharged. Because this transcript and the testimony contained in it did not exist until years after Ross's trial, no one at Ross's trial could have conceivably withheld or suppressed it. Consequently, Ross cannot tether this testimony to the alleged constitutional violations he charges, and thus, he cannot establish that, but for the constitution violation, no reasonable juror could have found him guilty. Nor does the testimony in this 2008 case suggest Hayne falsely testified at Ross's trial that he held certain opinions about the distance of the gun from Deidre's head when it was discharged.

Ross's reliance on, *Jones v. State*, 962 So. 2d 1263 (Miss. **2007**), Mississippi Supreme Court Cause No. 2006-KA-00134-SCT (App. 57), is no more persuasive. In that trial, occurring five years after Ross's, Hayne testified a shooter was within at least 2.5 feet from the victim and could have been farther. Ross does not explain how this testimony proves Hayne's opinion testimony at Ross's trial concerning the distance between Deidre's head and the gun was false. And, it is certainly not clear and convincing that had testimony from this 2007 trial been readily available to Ross' jury, no reasonable juror would have found him guilty. Lastly, it is obvious that since this testimony did not exist as of Ross's trial, it could not have been suppressed or withheld in violation of Ross's constitutional rights.

Ross's reliance on *Maye v. State*, 49 So. 3d 112 (Miss **2010**), Mississippi Supreme Court Cause No. 2007-CT-02147-SCT (App.58) is no better founded. In that case, occurring eight

years after Ross's trial, Hayne testified, "with the decedent in an upright positon or even leaning slightly forward, I would expect the weapon to be in a relatively higher position than the gunshot wound." First of all, like so much of what Ross relies on to ground his successive habeas petition, this material is not remotely tethered to one of the constitutional violations he asserts. Coming years after Ross's trial, this information could not have been suppressed or withheld by anyone, and on its face, it does not suggest Hayne – even if, *arguendo*, a state actor at Ross's trial – falsely testified about his opinions. There is simply nothing about this testimony to clearly establish Ross's innocence.

Ross cites to a pre-publication copy of "Strengthening Forensic Science in the United States: A Path Forward," ***copyrighted 2009***, (App. 45), an approx. 200+ page publication, for the proposition that in addition to the study of markings on a gun or bullet "firearms examination also includes the determination of firing distances, the operability of a weapon and sometimes the analysis of primer residue to determine whether someone recently handled a weapon." Obviously having not been published for over five years after Ross's trial, this material could not have been suppressed or withheld from Ross. Moreover, there is no suggestion that Hayne testified at Ross's trial to anything that even contradicted this quoted language.

Like Ross's reliance on Appendix 45, his reliance on an excerpt from "Medico-legal Investigations of Death," dated by Ross from ***2002***, (App.54) is unconvincing. This publication, in so far as the factual predicate it supports is concerned, merely informs the reader there are various subspecialties in the study of ballistics and that to accurately access the range of fire, requires test firing the gun with the type of ammunition that was used in the shooting. Certainly, such information cannot credibly be argued by Ross not to have been available to his counsel and

his expert in advance of his trial and his initial habeas petition or to have been unconstitutionally suppressed. Further, Hayne did not perform the actual test firing in Ross's case.[9]

An excerpt from "Malcom J. Dodd, Terminal Ballistics: A Text and Atlas of Gunshot Wounds 37," dated by Ross from **2006**, (App.55) is cited by Ross for the proposition that, "weapons should be test fired under controlled conditions, and an independent report should be sought from the ballistics department." Since this text did not exist as of Ross's trial, it could not have been disclosed or suppressed thereat. Also, Ross does not explain and the undersigned cannot discern, how this text conceivably could establish Hayne's ballistics opinions at Ross's trial were false. Certainly then, the undersigned cannot find Ross has clearly established that, when viewed in the context of the whole of the evidence, but for a constitutional violation occasioned by the non-disclosure of this text, no reasonable juror could have found Ross guilty. In fact, as noted, in Ross's case, Hayne, though present for the test firing of the gun that killed Deidre, did not perform it himself.

### J. Factual Predicate # 10: Hayne testified falsely at Ross's trial that Deidre's bruises were consistent with blunt force trauma from a hand or foot.

Ross only cites to the transcript of Hayne's testimony at his trial in support of this factual predicate, but he does not explain – and the undersigned can't fathom – how this testimony could conceivably be newly discovered.

### K. Factual Predicate # 11: Hayne testified falsely at Ross's trial that women shoot themselves in the chest more often than the head at a ratio of 4 to 5 to 1.

Although Ross asserts Hayne falsely testified to this effect and cites to an excerpt from "Vincent J.M. DiMaio, Gunshot Wounds 53 (2nd ed. 1999), dated by Ross from **1999**, *(App. 52)*

---

[9] To the extent this article also addresses the manner in which women, as opposed to men, most frequently commit suicide (a subject forming the basis of a separate factual predicate asserted by Ross), it is addressed below under that factual predicate.

as proof that the scientific data does not support Hayne's assertion, a review of the testimony given by Hayne at Ross's trial reflects that Hayne merely testified that, *in his experience*, women commit suicide by gunshot to the chest 4 to 5 times more often than they do so by gunshot to the head. Moreover, Ross with his own expert in pathology could easily have discovered the actual statistical data on this subject for Ross's trial or his initial habeas petition. Finally, there is nothing about this alleged factual predicate from which it can be concluded, when viewed against the whole of the evidence, that no reasonable juror could have convicted Ross.

**L. Factual Predicate # 12: Hayne testified falsely at Ross's trial that he was "a state pathologist" for the Department of Public Safety Medical Examiner's Office for the state of Mississippi**.

Ross asserts the false implication of this testimony was that Hayne was an employee of the State Medical Examiner's Office and, therefore, a neutral disinterested witness for the state. However, even if the undersigned accepts the asserted implication of this testimony, it does nothing to advance Ross's petition since there is nothing newly discovered about this testimony or the implication Ross asserts his jury drew from it.

**M. The evidence as a whole.**

Even if Hayne had not testified at Ross's trial, the evidence remains that after Ross threw a beer bottle at Deidre, verbally abused and physically removed her from a party, and one of her children observed her on the floor of their home, screaming. And after leaving the party, she suffered numerous bruises and scratches to her arms and face. Apparently, Ross would have a jury believe the many bruises and scratches she suffered were, like he contends the gunshot that followed was, self-inflicted. Even more incredibly, Ross suggests all of this occurred without his

knowledge.  Even though according to Captain Smith, he reported to have just gotten up from their bed and walked over to a chest of drawers when Deidre was shot.

Additionally after Deidre was shot in the left side of her head, she was observed by the crime scene investigators with a pistol in her left hand. Her left arm was positioned so that the gun and her left hand rested on her chest. Deidre was *not* left handed.  The suggestion that Deidre, unbeknownst to Ross but in his presence, accessed a gun with her non-dominant hand from an unidentified location, shot herself in the head at an awkward angle while remaining under the bedclothes, and without leaving any identifiable fingerprints on the gun is not credible. Further, Deidre could not have lowered her left arm while holding the pistol in her grip and placed it across her chest with a bullet having just traversed her brain from left to right.

Moreover, Ross's effort to explain away the unlikely positioning of Deidre's left arm by suggesting he cradled her after she was shot is inconsistent with the absence of any but a few spots of blood on his shirt.  He also does not explain how cradling someone causes their lifeless arm to move down to their chest while gripping a pistol. Importantly, as well, there is no evidence that Deidre was suicidal. On the contrary, there was abundant testimony that she had been in a good mood that evening. In fact, Deidre had lost 150 pounds relatively recently and was planning a "tummy tuck" at the time of her death.

## VI. Conclusion

In short, most of the alleged newly discovered evidence cited by Ross is demonstrably not new at all. Further, nothing about Hayne's relationship with the state – unethical or otherwise, his board certification – whether legitimate or not, or his alleged false ballistics testimony in this case clearly establishes, when viewed against the evidence as a whole, that no reasonable juror could have found Ross guilty.

The parties are referred to L. U. Civ. R. 72(a)(3) for the applicable procedure in the event any party desires to file objections to the findings and recommendations herein contained. The parties are warned any such objections are required to be in writing and must be filed within fourteen days of this date. Failure to timely file written objections to the proposed findings, conclusions and recommendations contained in this report will bar an aggrieved party, except upon grounds of plain error, from attacking on appeal unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Respectfully submitted this, the 30th day of July, 2015.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**